[No. H031178. Sixth Dist. Dec. 30, 2008.]

FOOD PRO INTERNATIONAL, INC., Plaintiff and Appellant, v.
FARMERS INSURANCE EXCHANGE, Defendant and Respondent.

COUNSEL

The Zumwalt Law Firm, Frank T. Zumwalt; Austin & Cannon and Daniel B. McCarthy for Plaintiff and Appellant.

Buchalter Nemer, Harry W. R. Chamberlain II, Robert M. Dato, Efrat M. Cogan; Coddington, Hicks & Danforth, Lee J. Danforth and Lisa A. Costello for Defendant and Respondent.

OPINION

**MIHARA, J.**—An injured construction worker brought a tort action against appellant Food Pro International, Inc. (Food Pro), relating to an injury at a food processing plant. Food Pro tendered defense of both the worker's action and a related action to its insurance carrier, respondent Farmers Insurance Exchange (Farmers). Farmers denied coverage, and this action against Farmers for breach of contract and breach of the implied covenant of good faith and fair dealing followed. The trial court entered judgment for Farmers following a court trial on Farmers's duty to defend. On appeal, Food Pro contends the trial court erred in finding that Farmers did not have a duty to defend Food Pro pursuant to a commercial general liability (CGL) insurance policy. Food Pro also appeals from the trial court's earlier summary adjudication of Food Pro's claim for punitive damages. We find no merit to Food Pro's punitive damages argument, but conclude that the trial court erred in finding that Farmers had no duty to defend Food Pro. We therefore reverse the judgment.

## I. Background

### A. Factual Background

Food Pro is a consulting firm that prepares and implements "plans for food processing and distribution operations." Its personnel are "food production and distribution specialists" that "offer a complete range of consulting engineering services from studies (e.g., long range planning, feasibility, site selection) to construction and equipment installation management."

Mariani Packing Company (Mariani), a fruit processor, hired Food Pro to assist the company in the relocation of its operations from San Jose to a new Vacaville plant. According to Food Pro's proposal and contract with Mariani, Food Pro's work for Mariani was divided into three phases: (1) a preliminary design phase involving the development of "the conceptual plan and design

criteria," (2) a final design phase involving the development of "detailed plans and specifications," and (3) an equipment installation phase involving the coordination of "the implementation of the plans to help insure that the final result conforms to the plans and specifications and is completed on time and within budget." During the final phase, Food Pro's duties were to include acting as Mariani's representative vis-à-vis the contractors and suppliers, coordinating contractor activities on the project, updating the schedule, and "mak[ing] on-site inspections of the work in progress as required to determine, in general, if the work is proceeding in accordance with the contract documents." Food Pro's efforts during this phase were to be "directed toward providing assurance that the completed Project will conform to the contract documents and that the major elements of work are carried out in proper sequence." Food Pro was not required under the contract with Mariani to take action to protect workers from injury or to otherwise ensure the safety of the site.

In February and March of 2001, Steve Aamold, a processing specialist with Food Pro, was at the Mariani plant in San Jose to ensure that the relocation was proceeding smoothly and that the contractors were acting within the schedule. As part of Food Pro's role in observing the process and reporting progress to Mariani, Aamold kept a daily log with notes recording which contractors were working on which projects and how the work was proceeding. As Mariani's day-to-day production operations were ongoing alongside the relocation of equipment, a full complement of Mariani employees was often on the site as well. Food Pro helped facilitate the simultaneous work, but was merely a consultant on the site. Mariani acted as its own general contractor. Although Food Pro was involved in the bid process for contractors, the contractors, once chosen, contracted directly with Mariani.

Walther Electric Company (Walther Electric), an electrical contractor, was hired by Mariani to disconnect equipment at the San Jose plant. Roy Pettigrew was a Walther Electric employee. In February 2001, Walther Electric disconnected the electricity for a fruit extruder machine that spanned the mezzanine level of the plant to the main floor below. Valley Welding and Machine (Valley Welding), a mechanical contractor, dismantled and removed the machine. The removal of the extruder left a large hole in the floor of the mezzanine, with a six-inch-high curb around it, that Valley Welding failed to secure prior to leaving the site. Aamold recognized a danger, and apprised Mariani's mechanics so that they would address the problem. Mariani's employees placed sheet metal and a plastic pallet over the opening, but did not bolt down the materials. The hole was in this condition for about a week prior to the incident at issue.

On March 5, 2001, Walther Electric's crew returned to the San Jose plant after a stint at the new Vacaville facility. The crew arrived at the site about 90

minutes before their foreman did, and began some electrical mapping work. Around 8:00 a.m., while Aamold was talking to the newly arrived foreman, Pettigrew fell through the extruder opening in the mezzanine to the floor below. He was severely injured. Pettigrew said he was tracing electrical lines on the ceiling when he fell, but there were no eyewitnesses. Pettigrew knew the opening was there, having seen it when the machine was removed, but had been absent from the site for about a week.

## B. Insurance Background

At the time of the Pettigrew incident, Food Pro was covered by a $1 million CGL insurance policy issued by Farmers.[1] The CGL policy states generally that Farmers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and "will have the right and duty to defend the insured against any 'suit' seeking those damages." The CGL policy is modified by the following endorsement entitled "EXCLUSION-ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY: [¶] . . . [¶] This insurance does not apply to 'bodily injury,' . . . arising out of the rendering or failure to render any professional services by or for you, including: [¶] 1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs, specifications; and [¶] 2. Supervisory, inspection or engineering services."

In July 2001, Explorer Insurance Company (Explorer), the insurer responsible for Pettigrew's workers' compensation benefits, notified Food Pro of a claim against Food Pro for reimbursement of the benefits paid to Pettigrew. Upon receipt of the letter from Explorer, Food Pro notified Farmers of the claim and Farmers began an investigation. Farmers's representative obtained a recorded statement from Aamold and William Washburn, Food Pro's president, on August 3, 2001. The representative also received a copy of the Mariani contract and Aamold's log notes for the relevant period of time. On October 18, 2001, Farmers notified Food Pro that it believed Farmers had "no obligation to indemnify" Food Pro for the Pettigrew incident, citing the professional services exclusion. Food Pro requested reconsideration of Farmers's position, explaining that the incident was not connected to Food Pro's rendering or failing to render professional services.

In November 2001, Farmers referred the matter to outside counsel, Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone (Berger Kahn) for a

---

[1] Beginning in the 1970's, Food Pro obtained professional liability insurance coverage first through another insurance company and then through Farmers. In 1996, Farmers informed Food Pro that its professional services coverage would not be continued. From 1996 to 2001, Farmers issued yearly CGL policies to Food Pro. Food Pro elected not to obtain separate professional liability coverage.

coverage opinion. Berger Kahn agreed with Farmers's initial assessment and further found no duty to defend. Before Farmers had communicated this position to Food Pro, Farmers received notice that Pettigrew and Explorer had filed suit against Food Pro. Pettigrew's complaint against Food Pro, Mariani, and others, filed on March 4, 2002, alleged general negligence and premises liability. Pettigrew claimed that the defendants "failed to properly cover or guard the hole and/or place warnings around the hole creating a dangerous condition" and "negligently allowed and/or required and ordered [Pettigrew] to work in the area of the dangerous hole." Explorer, in a separate action, asserted a single cause of action against Food Pro for general negligence.[2] Food Pro tendered the defense of these actions to Farmers, which then forwarded the complaints to Berger Kahn to reexamine Farmers's duties in light of the complaints' allegations. Berger Kahn reiterated its recommendation to deny coverage.

On May 6, 2002, Farmers informed Food Pro that it had "concluded that it has no obligation or duty to defend or indemnify" Food Pro in regard to the Pettigrew or Explorer actions and again cited the professional services exclusion. Food Pro objected to the denial of coverage on at least two subsequent occasions, providing additional information regarding the incident. Additional correspondence between the parties followed, but Farmers did not change its position. Farmers's asserted rationale was that the only reason that Food Pro was present at the site was to perform a contract for consulting engineering services; thus, the claims sought by Pettigrew and Explorer were not covered.

In January 2003, Farmers sought a second coverage opinion from Gordon & Rees regarding the claims against Food Pro. Gordon & Rees likewise concluded that Farmers had no duty to defend or to indemnify Food Pro due to the application of the professional services exclusion. Additional correspondence with Food Pro and its counsel followed as Food Pro continued to assert that the allegations involved only ordinary negligence, not professional negligence, and stressed that Food Pro had no responsibility for the removal of the extruder. In July of 2003, Farmers offered $25,000 to settle with Food Pro without admission of coverage or liability. The offer was left open until March 2005, through settlement talks in the underlying actions, but Food Pro did not accept the offer to compromise.

Initially, Food Pro retained counsel to defend the Pettigrew and Explorer actions, but Food Pro's counsel eventually received permission to withdraw for nonpayment of fees. In March 2005, unable to continue to defend the

---

[2] In May 2002, Mariani filed a cross-complaint against Food Pro and others for indemnification, apportionment of fault, and declaratory relief. The cross-complaint contains no claim for professional malpractice.

action due to a lack of funds, Food Pro agreed to have its answer stricken and a default judgment entered. After the default hearing on March 15, 2005, judgment was entered in favor of Pettigrew in the net amount of $1,621,627 and in favor of Explorer in the net amount of $114,681. Food Pro tendered the judgments to Farmers for payment. Farmers denied the tender on September 13, 2005.

## C. Current Action

Food Pro filed a complaint against Farmers on October 11, 2005, asserting breach of contract based on Farmers's refusal to defend Food Pro in the Pettigrew and Explorer actions and tortious breach of the implied covenant of good faith and fair dealing. The complaint seeks both compensatory and punitive damages.

Farmers moved for summary judgment. The trial court's order, filed on November 2, 2006, states in relevant part: "The exclusion in [the policy] does not apply to [Food Pro's] failure to render professional services that it was not obligated to render. [¶] In this case, there was an underlying factual dispute concerning whether [Food Pro] was responsible for creating or correcting the dangerous condition or for generally maintaining the safety of the San Jose facility. Until this underlying factual dispute was resolved, a legal determination could not be made as to: (1) whether Pettigrew's injuries occurred during [Food Pro's] performance of professional services; and (2) whether Pettigrew's injuries were caused by the deliberate and intentional act of the rendering of professional services or advice. [¶] . . . [Farmers] had a duty to defend [Food Pro] until this potential for coverage was eliminated. . . ." The court further denied Farmers's motion for summary adjudication of the second cause of action, noting that an insurer's reliance on the advice of counsel does not insulate it from a bad faith claim if the advice is unreasonable. However, the court granted Farmers's motion for summary adjudication as to the punitive damages claim, concluding that Farmers had established that Food Pro "does not have clear and convincing evidence of fraud, malice, or oppression."

Farmers brought an ex parte application to modify the court's summary judgment order and for other ancillary relief. In response, the trial court clarified its November order by stating, in part, that "[Farmers's] motion was denied on the ground that [Farmers] failed to meet its burden of establishing the absence of any potential for coverage because its evidence showed that there was a potential for coverage." The order also noted that the court had not granted summary judgment or adjudication to Food Pro, who had not moved for summary judgment. This court denied Farmers's subsequent petition for writ of mandate.

One month later, the duty to defend issue was again presented to the trial court in the form of a court trial. The parties made available the same evidence relied on in the summary judgment motion and presented a joint exhibit list for review. On December 4, 2006, the trial court issued its statement of decision. The court found that Food Pro "easily established a prima facie case for coverage and a duty to defend by introducing the CGL policy and third party complaints filed against it in the underlying action." The court concluded "[a]s a matter of law," however, "that the undisputed extrinsic evidence known to Farmers at the time of tender, and relied upon by Farmers to deny coverage, conclusively negates coverage and establishes that the only reasonable conclusion possible is that the injury to Mr. Pettigrew 'arose out of the rendering or failure to render professional services by or for' FoodPro's employee, Mr. Aamold, 'including supervisory, inspection or engineering services.' " The court found specifically that Food Pro was responsible for "issuing all instructions to contractors" and "coordinating all contractor activities" on site and that Aamold's log notes undisputedly established that he directed Pettigrew and the Walther Electric crew to work in the area of the hole on the morning of the incident. The court thus concluded that the *undisputed evidence* establishes that the bodily injury suffered by Pettigrew arose out of FoodPro's rendering of supervisory services, which is excluded under Endorsement CG22431185."

The trial court further found that because the injury occurred as a result of the rendering of professional services, which are intentionally provided, there was no "occurrence" under the terms of the policy and, therefore, no coverage. Finally, the trial court found no reasonable expectation of coverage under the policy and held that judgment should be entered for Farmers.

Food Pro's subsequent motion for a new trial was denied, and the court entered judgment for Farmers on January 29, 2007. Food Pro timely appealed. On appeal, Food Pro challenges both the duty to defend determination and the punitive damages ruling in the summary judgment order.

## II. Discussion

### A. Duty to Defend

We consider first Food Pro's contention that the trial court erred in concluding that undisputed extrinsic evidence established that there was no potential for coverage and, thus, no duty to defend.

### 1. Standard of Review

Appellate courts apply an independent standard of review to decisions interpreting, constructing, and applying insurance policies to determine the

scope of actual or potential coverage. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 389–390 [33 Cal.Rptr.3d 562, 118 P.3d 589].) More specifically, "[w]hen determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).)

■ "[A] CGL policy, often referred to as a business general liability policy, provides liability insurance for businesses." (*Waller, supra,* 11 Cal.4th at p. 16.) In general, "CGL policies are limited to providing coverage for accidental occurrences, and do not provide coverage for professional negligence claims." (*Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 713 [118 Cal.Rptr.2d 561] (*Tradewinds*).) "The policy is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause." (*Waller*, at p. 16.) "[P]olicy exclusions are strictly construed [citations], while exceptions to exclusions are broadly construed in favor of the insured . . . ." (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 471 [9 Cal.Rptr.3d 701, 84 P.3d 385].)

## 2. General Principles Relating to the Duty to Defend

■ "It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." (*Waller, supra,* 11 Cal.4th at p. 19; see *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).) The duty to defend is both separate from and broader than a duty to indemnify. (*Waller*, at p. 19; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*).) Thus, to prevail in a duty to defend action "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* . . . [T]he insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" (*Montrose*, at p. 300, original italics.) Because the duty is based " 'upon those facts known by the insurer at the inception of a third party lawsuit,' " " 'the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' " (*Montrose*, at p. 295.) As our high court has explained, "[i]mposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf." (*Ibid.*)

"[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Waller, supra,* 11 Cal.4th at p. 19; see *Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1048 [92 Cal.Rptr.2d 473].) "Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability." (*Waller,* at p. 19; see also *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1038–1039 [123 Cal.Rptr.2d 256] (*Atlantic*) ["[a]n insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies"].)

### 3. Professional Services Exclusion

Farmers's position is that the Mariani contract and Aamold's log notes "established without dispute that the insured's conduct fell squarely within the 'professional services' exclusion" and, thus, there was no duty to defend. Food Pro counters that Farmers and the trial court mischaracterize the extrinsic evidence as undisputed and apply the professional services exclusion so broadly that the exception swallows the rule. We find merit in Food Pro's argument.

■ Professional services, broadly defined, involve " ' "specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual." ' " (*Tradewinds, supra,* 97 Cal.App.4th 704, 713.) Food Pro's CGL policy further defines professional services as "preparing, approving, . . . maps, drawings, opinions, reports, surveys, change orders, designs, specifications[,] and . . . [s]upervisory, inspection or engineering services." We note at the outset that it is clear that Food Pro, as an engineering consultant for equipment installation, provides professional services as the term is used in the CGL policy. Moreover, Food Pro's contract with Mariani involved the provision of professional services, including the development of detailed designs and specifications and high-level supervision of the plant relocation. This fact is not disputed. The issue presented involves the extent of Food Pro's professional services, the nature of Aamold's actions as they relate to the Pettigrew incident, and the breadth of the professional services exclusion.

First, we consider the court's summation of the "undisputed" evidence. The trial court, without recognizing any alternative theories or contradictory evidence, accepted as undisputed Farmers's explanation of Aamold's role at the San Jose plant and his involvement with Walther Electric on the day of the incident. The court stated broadly that "[a]lthough FoodPro was not

expressly responsible for the safety of the San Jose site by the terms of its contract with Mariani, *it was responsible for issuing all instructions to contractors*, administering all building modification and equipment installation contracts, and coordinating all contractor activities." Additionally, the court reasoned that "Aamold was indeed providing professional services at the San Jose facility *when he sent Pettigrew* to work in the area of the hole left by the removal of the extruder. Knowing that the Walther foreman responsible for his crew's safety was not present and would not arrive until 7:00 a.m., Aamold's notes show that *he ordered Pettigrew* and the other electricians at 6:45 a.m. to start work near the area of the dangerous condition. Pettigrew's accident occurred shortly thereafter, while Aamold was talking to the Walther foreman."[3]

The summary of Food Pro's role at the San Jose plant and the recital of Aamold's interaction with Walther Electric on March 5 gloss over several contested details that impact the professional services analysis. From the first conversation with Farmers, Aamold and Washburn explained unequivocally that it was Mariani's responsibility to cover the extruder opening. They noted that Food Pro was not obligated to ensure the safety of the site, that each contractor had its own set of safety standards, and that Food Pro informed the contractors that it was their responsibility to check the work areas and to confirm they were safe. Aamold and Washburn also explained that Food Pro's role was to determine which equipment needed to be disconnected at what time and to keep the contractors to this overall schedule. It was, however, up to the individual contractor to determine how to complete each project that was an identified step in the relocation process. In other words, Food Pro's supervisory role was limited to coordination of the overall process and the contractors were responsible for the details of their work. In addition, Mariani hired Valley Welding to relocate the machine without Food Pro's involvement and Valley Welding removed the extruder "under direct . . . instruction from . . . the Mariani staff."

At Aamold's November 2003 deposition, he reiterated that he was not under an obligation to ensure the safety conditions at the site and further explained he did not have the authority to direct Mariani employees, just to

---

[3] The log note for March 5, the date of the incident, includes the following: "3 'Walther' men here waiting since 6 AM for foreman Steve Rogers who thought it was 7AM start . . . ~ 6:45 AM got the Walther guys started on the fruit stick line disconnect[.] Steve Rogers arrived ~ 7:30 AM discussed disconn. of frt stk line were on way to review cut fruit room equip. when Roy P fell thru extruder opening in mezz. to sugar room floor below[.] ~ 7:52 I called '911' for ambulance for Roy . . . ."

request and advise.[4] He also reiterated that the removal of the extruder "was independently arranged between Miguel Guzman [of Mariani] and Valley Welding" and "was not part of our responsibility."

Aamold's interactions on March 5 with the Walther Electric crew are likewise disputed. During the recorded conversation with Farmers in August 2001, Aamold explained that before the foreman's arrival, the Walther Electric crew began some electrical tracing work related to the extruder. They had disconnected the machine in a hurried fashion about a week earlier, and needed to verify the routing information to reinstall the machine in Vacaville. Aamold did not direct the crew that morning; Aamold presumed they were following prior orders from their foreman. Aamold reiterated in his 2003 deposition that the crew, in the absence of their foreman, "understood what needed to be done, and they were proceeding with their tracing of lines and doing their disconnect work." The crew had planned what to do a week earlier, before their break from the San Jose site. Thus, according to Aamold, the crew was completing a predetermined project prior to their foreman's arrival and at the time of Pettigrew's accident. This contradicts the court's conclusion, based solely on Aamold's sparse log notes, that the crew had begun new work on the fruit stick line at Aamold's express direction at the time Pettigrew was injured.[5]

■ The above evidence—available to Farmers at the time of the initial declination of coverage in October 2001 and reaffirmed while the underlying actions were ongoing—presents a plausible, well-supported description of Aamold's role and actions on March 5 that differs significantly from the trial court's summation and from Farmers's position on appeal. These facts indicate that Food Pro's professional services to Mariani did not extend to the creation of the hole, the safety of the site, or the direction of Pettigrew and the Walther Electric crew to the extruder area on the morning of March 5. In other words, Aamold was not providing supervisory or engineering services, or any other specialized skill, in relation to Pettigrew's accident.

Food Pro's facts instead suggest Aamold's involvement in the accident was merely as an observer who noticed the danger and notified the responsible party. Thus, any failure to rectify the situation or warn of the danger, as alleged in the Pettigrew complaint, would implicate only ordinary negligence.

---

[4] The deposition occurred in connection with the underlying actions, after Farmers's initial declination of coverage but at a time in which Farmers's offer to compromise (without Farmers admitting coverage or a duty to defend) was outstanding.

[5] Aamold never testified regarding the meaning of the March 5 log notes, and Farmers never requested an explanation of his note regarding the Walther Electric crew. Absent a definitive explanation, the log note could indicate that Aamold had simply informed the Walther Electric crew that the fruit stick line could now be disconnected (i.e., that the fruit stick machinery was the next project scheduled for completion).

Pettigrew claimed that the defendants, including Food Pro, failed to secure the hole and "negligently allowed and/or required and ordered [Pettigrew] to work in the area of the dangerous hole." The alleged link between Food Pro's responsibility for Pettigrew's injury and its professional services is its supervisory role, the extent of which is disputed. The complaint does not allege, for instance, that the injury was related to Food Pro's designs or specifications for the relocation and installation of Mariani's processing operations, or to other engineering work. This is consistent with Mariani's cross-complaint against Food Pro, which does not include any claim for breach of the consulting contract or for any form of professional malpractice. The facts available to Farmers at the time it denied a duty to defend thus show potential liability arising from the breach of a common law duty, and not from the performance of professional services. Faced with the disputed facts revealing a possibility the claim was covered, Farmers could have filed a declaratory relief action or otherwise sought a judicial determination regarding its duty to defend. (See generally *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1792 [23 Cal.Rptr.2d 73] (*Amato*) [if duty to defend is unclear, the insurer may, in addition to simply denying the defense, defend with a reservation of rights, file a separate declaratory relief action, file a cross-complaint for declaratory relief in the underlying action, or deny the request with the promise to reimburse if later investigation shows a defense is owed].) Absent a trial to resolve the genuine factual dispute, Farmers could not conclusively negate the potential for coverage and, therefore, had a duty to defend Food Pro. (See *Atlantic, supra*, 100 Cal.App.4th 1017, 1040; *Amato*, at p. 1790, citing *Horace Mann, supra*, 4 Cal.4th 1076, 1081 ["the existence of a disputed fact determinative of coverage, *establishes* the duty to defend"].)

Farmers contends, however, that under any interpretation of the facts, Aamold was only at the site to perform his professional duties; thus, any act of his at the site that resulted in injury "arises from" a professional service and is covered by the exclusion. As support for this broad interpretation of the professional services exclusion, Farmers primarily relies upon *Tradewinds, supra*, 97 Cal.App.4th 704, and a handful of additional cases considering the professional services exclusion. We find the cases factually distinguishable, and conclude that they do not support the broad interpretation of the professional services exclusion that Farmers sets forth.

In *Tradewinds*, the plaintiff in the underlying action alleged that the insured, an escrow company, wrongfully failed to close escrow on a home she sought to purchase, causing the transaction to fail. (*Tradewinds, supra*, 97 Cal.App.4th at pp. 707–709.) The escrow company's insurer refused to defend, citing a professional services exclusion that extended to the services of escrow agents. (*Id.* at p. 708.) In considering the applicability of the professional services exclusion, the *Tradewinds* court noted that "the unifying

factor" in cases upholding the exclusion is "whether the injury occurred during the performance of professional services, not the instrumentality of the injury." (*Tradewinds*, at p. 713, citing *Antles v. Aetna Casualty & Surety Co.* (1963) 221 Cal.App.2d 438 [34 Cal.Rptr. 508] (*Antles*) and *Hollingsworth v. Commercial Union Ins. Co.* (1989) 208 Cal.App.3d 800 [256 Cal.Rptr. 357] (*Hollingsworth*).) The court then found that the buyer's claims against the escrow company fell within the exclusion "because the alleged wrongful acts were committed during the performance of professional services, namely, the rendering of escrow services." (*Tradewinds*, at p. 713.)

*Tradewinds* is not controlling in the instant case. There, it was undisputed that escrow services were the professional services that the escrow company provided and to which the exclusion applied. (See *Tradewinds, supra,* 97 Cal.App.4th at p. 709.) There was no negligence claim and the allegations of intentional misconduct related to the provision, or lack thereof, of escrow services to one of the parties to the real estate transaction. (See *id.* at p. 707.) In addition, the court alternatively found no coverage because intentional conduct was excluded under the policy. (*Id.* at p. 714.) Here, the Pettigrew complaint does not allege misconduct relating to the adequacy of Food Pro's performance of professional services to its client, Mariani. Accepting Food Pro's facts regarding the extent of its site supervision and contractor direction, the underlying actions implicate only a separate act of ordinary negligence involving a third party. Nevertheless, Farmers seizes upon the *Tradewinds* court's general observation regarding the "instrumentality of the injury" to argue that the professional services exclusion requires only a temporal connection between the allegedly wrongful act and the performance of professional services; if the injury occurred while the insured was performing professional services, it arises out of the rendering of professional services regardless of the connection, or lack thereof, between the allegedly wrongful acts and the professional services.

To apply properly the quoted statement in *Tradewinds*, which purports only to summarize a common thread in professional services exclusion cases, and to place Farmers's argument in context, we examine the facts in *Tradewinds*'s authorities and the related case relied upon by Farmers. In *Hollingsworth*, the court considered only whether the piercing of a customer's ears by an employee of a cosmetics business was a professional service. (*Hollingsworth, supra,* 208 Cal.App.3d at p. 805.) The piercing of the customer's ears resulted in serious injury, and the court held that "in the context of a cosmetics business, ear piercing clearly constitutes a professional service as distinguished from an activity incidentally related to its everyday operations." (*Id.* at pp. 808–809, 803.) In *Antles*, the insured was a chiropractor and the injured party a patient. (*Antles, supra,* 221 Cal.App.2d at pp. 439–440.) The injury occurred when a heat lamp fell and burned the patient during a chiropractic treatment. (*Id.* at p. 440.) The heat lamp had been negligently

installed by a third party, but the court found that because the lamp was being actively used in the chiropractic treatment (i.e., the professional service), the injury arose from the performance of a professional service and the exclusion applied. (*Id.* at pp. 442–443.) Finally, in *Northern Insurance Co. v. Superior Court* (1979) 91 Cal.App.3d 541, 543 [154 Cal.Rptr. 198] (*Northern Insurance*), the insured was a doctor and the injured party a patient who was injured during a medical procedure. The doctor mistakenly performed an abortion on the patient, after his medical staff confused the plaintiff's charts with those of another patient. (*Id.* at p. 543.) The court found that a doctor has a professional duty to correctly identify the patient before undertaking a procedure, and concluded that the injury "occurred during, and as a direct result of the performance of professional services." (*Id.* at p. 544.)

With this background, we read *Tradewinds*'s summation of the reach of the professional services exclusion as follows: the act that precipitated the injury need not have been one of professional malpractice, as long as the plaintiff was injured in the performance of the professional service. In *Antles*, the negligent installation of the lamp could be said to be the instrumentality of the injury, but the injury occurred during the chiropractic treatment and therefore arose from the performance of a professional service. Likewise, in *Northern Insurance*, the negligent identification of the patient by medical staff might have been the instrumentality of the injury, but the injury occurred during the doctor's performance of the incorrect medical procedure.[6]

These cases are distinguishable from, and the proposition stated in *Tradewinds* inapplicable to, the instant case. The injury in each arose from the performance of a professional service, not merely at the same time the insured was otherwise providing professional services to a third party. Here, the only link between Food Pro's rendering of engineering services and Pettigrew's injury is that the allegedly wrongful actions occurred while Food Pro was on site to provide professional services to Mariani. As Food Pro's evidence shows, it did not design or direct the removal of the extruder, nor did it direct Pettigrew's actions on March 5 as part of its professional services. In other words, Aamold's involvement in the Pettigrew incident arose from his presence at the site, but the injury did not "aris[e] out of the rendering or failure to render any professional services." The Pettigrew and Explorer actions therefore raised the potential for coverage under the CGL policy, and Farmers had a duty to defend.

---

[6] *Hollingsworth* is even further removed from this case. The injury not only arose during the performance of the professional service, but resulted from the misapplication of the technical skill required.

Our conclusion is consistent with the requirement that the court construe policy exclusions narrowly. Farmers's proposed interpretation of the provision, if accepted, would render the CGL policy inapplicable to any incident that occurs while Food Pro is on a project site as an engineering consultant. As Food Pro is an engineering firm, its general liability policy (as distinct from separate policies for automobile and premises liability) would be essentially useless.

■ To prevail on a claim for breach of the duty to defend, the insured need not prove coverage, but only the possibility of coverage at the time the claim is raised. "The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability. As a consequence, California courts have been consistently solicitous of insureds' expectations on this score." (*Montrose, supra,* 6 Cal.4th at pp. 295–296.) In this case, we find ample evidence that the claimed injury did not arise out of the rendering, or failure to render, professional services. In contrast, Farmers failed to meet its burden to show the absence of any potential for coverage, and, thus, breached its duty to provide the defense to which Food Pro was entitled. (See *id.* at pp. 295, 300.)

### 4. Occurrence Requirement

The CGL policy applies to a bodily injury only if the injury "is caused by an 'occurrence' that takes place in the 'coverage territory' " and "occurs during the policy period." " 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Farmers contends, and the trial court alternatively held, that the injury in this case was not caused by an "occurrence" and, thus, there was no duty to defend. However, Farmers's argument relies on the finding that Pettigrew's accident was caused by Food Pro's intentional provision of professional services: "Food Pro learned about the dangerous condition left by the removal of the extruder and deliberately sent Pettigrew to the area of the hole without taking any precautions to alleviate the danger. These undisputed facts conclusively demonstrate that Pettigrew's accident does not qualify as an 'occurrence' under the CGL policy." This argument thus rests on the same erroneous conclusion regarding the nature of Food Pro's conduct vis-à-vis the Pettigrew incident as the trial court's finding regarding the professional services exclusion. As such, it is likewise rejected.

### 5. Reasonable Expectation of Coverage

After concluding that Farmers had no duty to defend because Food Pro had not shown a potential for coverage under the express terms of the policy, the

trial court considered whether, in the alternative, the policy was ambiguous and Food Pro had a reasonable expectation of coverage that would give rise to a duty to defend.[7] The court reasoned that because Food Pro expressly declined professional errors and omissions coverage, and because Food Pro's "liability for the injuries to Mr. Pettigrew arose" from Food Pro's performance of professional services, Food Pro was not covered by the policy and cannot be said to have "had any reasonable expectation to the contrary." In its opening brief, Food Pro objects to the trial court's conclusion that it lacked any reasonable expectation of coverage. Because we find a potential for coverage under the terms of the policy, as addressed above, we need not consider whether this alternative theory creates a duty to defend. We note, however, that the court's conclusion regarding a reasonable expectation of coverage derives directly from its erroneous finding of "undisputed facts."

We are compelled, however, to address briefly Farmers's responsive argument on this issue. Farmers suggests that the trial court broadly determined that there was no coverage under the policy and argues that "[i]n the absence of coverage there can be no liability for insurance bad faith . . . ." Farmers thus contends that the court's finding regarding the lack of coverage is dispositive of Food Pro's claim for breach of the implied covenant of good faith and fair dealing. However, as noted, the court's coverage determination was premised on its erroneous finding regarding the relationship of Food Pro's professional services to the incident at issue and its overbroad application of the exclusion. The trial court did not hold separately that Food Pro had no claim for tortious breach of the implied covenant of good faith and fair dealing. In light of our findings regarding the duty to defend, the validity of Food Pro's bad faith claim is not appropriately resolved in this appeal and must be considered in the first instance by the court below.

## B. Punitive Damages

Food Pro contends the trial court improperly granted summary adjudication of its claim for punitive damages. We find no error.

### 1. Standard of Review and Standard of Proof

" 'Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo.' " (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 316 [40 Cal.Rptr.3d 313].) The party

---

[7] At the outset of its analysis, the court observed: "[I]n addition to the duty to defend suits potentially covered by the policy, the insurer has a duty to defend when the policy is ambiguous and the insured would reasonably expect the insurer to defend against the suit based on the nature and kind of risk covered by the policy."

moving for summary judgment bears the "burden of persuasion" that there are no triable issues of material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)

A claim for punitive damages requires "evidence which establishes by '*clear and convincing evidence*' that the defendant has been 'guilty of oppression, fraud, or malice.' If a plaintiff is to recover on such a claim, it will be necessary that the evidence presented meet this higher evidentiary standard. As the United States Supreme Court put it, in the context of ruling on a motion for summary judgment, 'the judge must view the evidence presented through the prism of the substantive [clear and convincing] evidentiary burden . . . .' " (*Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 481–482 [21 Cal.Rptr.2d 338], quoting *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 254–255 [91 L.Ed.2d 202, 106 S.Ct. 2505].) "The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not." (*Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at pp. 254–255; see *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1121 [105 Cal.Rptr.2d 153].)

## 2. Food Pro's Evidence Supporting Punitive Damages

■ " ' "Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." ' " (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1051 [117 Cal.Rptr.2d 685].) Thus, " '[p]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.' " (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1288, fn. 14 [31 Cal.Rptr.2d 433] (*Tomaselli*).)

Food Pro contends generally that "Farmers singlemindedly directed its efforts in this case to supporting a denial of coverage and defense to a

catastrophic injury claim." To support the claim for punitive damages, Food Pro relied on the declaration of Charles Miller, a claims adjuster and expert in insurance company practices. The declaration, with supporting exhibits, catalogues Farmers's alleged misconduct. Miller stated specifically: (1) Farmers's investigation was inadequate because it failed to interview anyone from Mariani or the relevant contractors; (2) Farmers relied on incorrect facts and "ignored evidence which would have supported coverage"; and (3) the coverage denial was unreasonable because it was based on the "false and incorrect assumption that any act that occurred during the course of the contract between Food [Pro] and Mariani would be excluded."[8] Miller concluded that "Farmers' conduct was unreasonable and did not comply with the standards and practices in the insurance industry for claims handling."

The asserted bad acts could be found to be negligent (an incomplete investigation and reliance on erroneous facts), factually and legally erroneous (an incorrect assumption regarding breadth of exclusion and failure to give proper weight to relevant facts), and even overzealous. However, Food Pro presented no evidence that "could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure." (*Tomaselli, supra*, 25 Cal.App.4th at p. 1288.) Although we disagree with Farmers's position regarding its duty to defend, Farmers relied upon two separate coverage opinions by two different law firms that arrived at the same conclusion regarding the lack of coverage. Moreover, the trial court agreed with Farmers, and the position cannot be deemed so unreasonable as to evidence malice, fraud, or gross negligence

Finally, in its opening appellate brief, Food Pro argues that there is no evidence of an objective investigation, of any serious consideration of the alternative to provide a defense with a reservation of rights, or of an evaluation of the ordinary negligence theory of liability. Assuming these sweeping statements are supported, the absence of an affirmative record documenting Farmers's consideration of these issues simply does not show that Farmers's actions towards Food Pro were malicious, fraudulent or in blatant violation of law or policy. In short, Food Pro failed to present clear and convincing evidence of tortious conduct that would justify the imposition of punitive damages. We therefore find no error in the trial court's summary adjudication of the punitive damages claim.

---

[8] Miller's declaration also stresses that Farmers improperly uses its claims department to improve profits, but points to no evidence that the decision in this case was based, in whole or in part, on these improper incentives.

### III. Disposition

The judgment is reversed.

Rushing, P. J., and Premo, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 15, 2009, S170363.