Filed 1/13/14  Armour v. IP Unity CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MAYA ARMOUR, | H036937 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV123547) |
| v. | |
| IP UNITY et al., | |
| Defendants and Respondents. | |

Plaintiff Maya Armour sued defendant IP Unity and its successor in interest Movius Interactive Corporation (formerly IP Unity Glenayre), alleging that IP Unity breached its employment agreement with her and violated Labor Code section 201 by failing to pay her severance benefits.  Armour also alleged that Movius breached its obligations and violated Labor Code section 201 by failing to pay her additional severance benefits under its reduction in force (RIF) severance policy.  The trial court granted summary adjudication in favor of defendants on Armour's first three causes of action.  The court dismissed the fourth cause of action without prejudice at her request. Judgment was entered on March 9, 2011.

On appeal, Armour contends that (1) whether she satisfied the release condition in her employment agreement presented a triable issue of fact that precluded summary adjudication of her first cause of action, and (2) statements about the reason for her

termination presented a triable issue of fact that precluded summary adjudication of her third cause of action.  We affirm.

## I.  Background

Armour signed a written employment agreement before she joined IP Unity, a provider of "carrier-grade communications solutions for the global market," as senior legal counsel in January 2004.  She was soon promoted to senior vice president and general counsel of IP Unity and became the corporate secretary.  She was "responsible for all legal matters of the company."

Armour's employment agreement was amended in November 2006.  Drafted by Armour herself, the amended agreement provided that "[i]n the event that your employment is terminated without Cause (as hereinafter defined) or by you for Good Reason (as hereinafter defined) following a Change in Control (as hereinafter defined), *then subject to you signing a release of all claims against the Company* you shall receive a lump sum payment . . . in the amount equal to [six] (6) months of base salary . . . , as well as the payment by the Company for six (6) months following such termination of all your medical and dental benefits, at the same levels of coverage provided immediately prior to such termination."  (Italics added.)

In late 2006, IP Unity decided to acquire the assets of Glenayre Messaging, the messaging division of Glenayre Electronics, Inc.  It created a subsidiary as a vehicle for acquiring those assets.  The subsidiary issued $35 million of Series A and $34.8 million of Series B preferred stock to fund the deal.  On December 30, 2006, IP Unity transferred all of its assets and liabilities to the subsidiary in exchange for all of the subsidiary's Series A preferred stock and 1,000 shares of its common stock.  An investor group purchased the subsidiary's Series B preferred stock.  On December 31, 2006, the subsidiary purchased the assets of Glenayre Messaging.  As part of the transaction, all former IP Unity employees became IP Unity Glenayre employees.  After the asset

2

acquisition, IP Unity Glenayre remained committed to IP Unity's then-current product lines and customers, and its focus remained "providing carrier-class messaging services and rich media distribution to users across disparate networks and devices."

The new company established its headquarters in Atlanta, Georgia. Armour was offered a position there and told that her continued employment with the company was contingent on her relocating to Atlanta. She turned the position down. In deposition, she explained, "I told them that I wanted to leave the company, that I didn't want to move to Georgia where the company was going to be headquartered . . . -- I told the CEO that he should make Tim Cohen, who was the general counsel of the Georgia company, the general counsel of Movius, and that I would do my best to close the transaction and do all the transition matters and transition all my institutional knowledge, and then I would leave." In deposition, Armour also verified an e-mail that she sent to one of the company's investors early in 2007: "Q: I'd just like you to verify that you sent this e-mail on January 11th saying that you had already given your spot away. 'I don't want to move there.' [¶] A: Yes. [¶] Q: And I assume you're referring to a role with IP Unity Glenayre in Atlanta. [¶] A: Yes." Armour said she knew that turning down the position in Atlanta would likely result in the termination of her employment.

In January 2007, IP Unity Glenayre instituted an "Involuntary Reduction in Force Severance Practice" for "all exempt and non-exempt, full-time and part-time employees" who were involuntarily terminated "due to a reduction in force/downsizing, change in company direction, or job elimination." The RIF policy expressly did not apply to "terminations for cause, refusal to be reassigned, or refusal to be relocated."

On January 19, 2007, Armour and 32 others were formally notified that their employment would be terminated, effective January 31, 2007, as part of an RIF. Each was offered a severance package that included IP Unity Glenayre's standard separation and release agreement. The separation agreement and release that Armour received in January 2007 provided that she would receive a lump sum payment equal to six months

3

of her current base salary and payment of medical and dental benefits for six months if she signed it on or before March 5, 2007. This was the same consideration contemplated by her amended employment agreement. Armour did not sign by the March 5, 2007 deadline, nor did she ask for any extension of time to consider the agreement.

On January 22, 2007, after Armour received notice of her termination but before its effective date, she became critically ill and was hospitalized. She informed IP Unity Glenayre that she would be taking a medical leave of absence. The company paid her salary through January 31, 2007, and, as an accommodation, deferred the effective date of her termination and extended her employment through the end of her disability period.

On March 30, 2007, Armour informed the company that she would not be released to work until June 1, 2007. On May 31, 2007, she notified the company that she would be released to work on June 1, 2007, but did not expect to return to the office until June 7, 2007. The company responded that her employment had been terminated effective June 1, 2007, the end of her disability period. The company further informed her that "[a]lthough you failed to complete and return the paperwork necessary to obtain the severance benefits that the company previously offered to you . . . , due to your disability and the resulting extension of your employment . . . , the company is prepared, purely as an accommodation, to offer to you a new severance package that is financially equivalent to your previously expired one."

The June 2007 separation agreement and release that Armour received was signed by IP Unity Glenayre's vice-president, general counsel, and secretary on June 8, 2007, and sent to her with a cover letter of the same date marked "Delivered By Overnight Mail." The agreement stated that "[e]mployee has 21 days from receipt of this Agreement to consider and accept this Agreement," after which "the Employee's right to accept shall expire." The agreement provided more generally that "[t]he severance offer contained in this Letter will expire and be of no further force and effect at midnight in Atlanta, Georgia on July 2, 2007, unless an original copy of the entire Agreement signed

4

in full by you without modification is returned . . . ." Armour never signed the June 2007 agreement.

On July 12, 2007, 10 days after the agreement's July 2, 2007 expiration date and more than a month after Armour had received it, her then-counsel e-mailed a demand letter and an *unsigned* proposed form of release to Troy Valdez at Wilson Sonsini Goodrich & Rosati.

In February 2008, IP Unity Glenayre changed its name to Movius Interactive Corporation.

On September 25, 2008, Armour filed suit against "IP Unity" and Movius, alleging that IP Unity breached its employment agreement with her and violated Labor Code section 201 by failing to pay her severance benefits and that Movius breached its obligations and violated Labor Code section 201 by failing to pay her additional severance benefits under its RIF policy.

In July 2010, defendants moved for summary judgment or, in the alternative, summary adjudication. The trial court granted summary adjudication in favor of defendants on Armour's first cause of action because the undisputed evidence showed that she had not satisfied the release condition in her employment agreement. It granted summary adjudication in favor of defendants on Armour's second cause of action because it was dependent on the first cause of action. It granted summary adjudication in favor of Armour's third cause of action because the undisputed evidence showed that she had refused to relocate to Georgia, and the RIF policy expressly did not apply to "terminations for . . . refusal to be relocated." Armour's fourth cause of action was dismissed without prejudice at her request. Judgment was entered on March 9, 2011. Armour filed a timely notice of appeal.

5

## II. Discussion

### A. Claimed Breach of Employment Agreement

Armour contends that whether she satisfied the release condition in her employment agreement presented a triable issue of fact that precluded summary adjudication of her first cause of action for breach of contract. We disagree.

" ' "Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." ' " (*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 993.) "[T]he party moving for summary judgment bears the burden of persuasion that there are no triable issues of material fact and that [the moving party] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) The moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid*.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

"[A] 'defendant . . . has met' his 'burden of showing that a cause of action has no merit if' he 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' [Citation.]" (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

" 'The standard elements of a claim for breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

6

damage to plaintiff therefrom. [Citation.]" [Citation.]' [Citation.]" (*Abdelhamid v. Fire Ins. Exchange* (2010) 182 Cal.App.4th 990, 999.) Here, defendants obtained summary adjudication of Armour's first cause of action on the ground that she could not prove the second element—performance or excuse for nonperformance of the contract.

After independently reviewing the evidence, we conclude that defendants satisfied their initial burden. (Code Civ. Proc., § 437c, subd. (p)(1).) They submitted evidence showing that the employment agreement, drafted by Armour herself, was expressly "subject to [her] signing a release of all claims against the Company." They presented additional evidence, including the declaration of the company's vice-president of human resources and excerpts from Armour's deposition, showing that Armour was twice presented with the company's standard separation agreement and release and did not sign either by its stated deadline. This prima facie showing by defendants shifted the burden to Armour to raise a triable issue of material fact. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

Armour submitted a declaration asserting that she did not sign the January 2007 agreement because she became ill. She did not sign the June 2007 agreement "as it was much broader and contained provisions never contemplated by" her amended employment agreement. Her then counsel "sent a letter indicating why the agreement was not satisfactory" and also sent "a form of a Release of All Claims that was consistent with the Amended Employment Agreement, and that I was prepared to sign." Copies of her counsel's letter and of the proposed release, which were e-mailed to Wilson Sonsini on July 12, 2007, were attached as exhibits to Armour's declaration. Defendants, she declared, "would not agree to the Release of All Claims agreement suggested by my counsel."

The evidence Armour proffered did not show that a triable issue of material fact existed. Indeed, she offered no facts, only conclusory assertions that the June 2007 agreement "was much broader and contained provisions never contemplated by" her amended employment agreement. Such conclusory assertions did not create a triable

issue of material fact. (*Zelasko-Barrett v. Brayton-Purcell, LLP* (2011) 198 Cal.App.4th 582, 591.) Nor did they excuse Armour from signing any release at all. Her employment agreement unambiguously stated that the company's payment of severance was "subject to *you signing a release* of all claims against the Company." (Italics added.) " 'Subject to' is generally construed to impose a condition precedent." (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 54.) "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (Civ. Code, § 1436.) "Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself . . . ." (Civ. Code, § 1439.)

The evidence before the trial court showed that Armour never signed defendants' standard separation agreement and release *or any other form of release* by the stated deadline. The proposed form of release that her counsel tendered instead was both *unsigned* and too late. Because the undisputed evidence showed that Armour failed to satisfy the release condition of her employment contract, the trial court properly granted summary adjudication in favor of defendants on her first cause of action.

Relying on Civil Code section 1440, Armour maintains that she "had no duty to propose a proper release" because "[w]hen defendants demanded she sign their overbroad Severance Agreement without modification, they waived their right to demand any release." The argument lacks merit.

Civil Code section 1440 provides that where one party to a contract notifies the other, before the other is in default, that he will not perform his part of the contract, the other party may enforce the contract without further performance on his part. (Civ. Code, § 1440.) An anticipatory breach of a contract "giv[es] the [nonbreaching party] a cause of action and avoid[s] the necessity of continuing to tender performance of [its] obligation under the contract." (*Jeppi v. Brockman Holding Co.* (1949) 34 Cal.2d 11, 18.) "Anticipatory breach must appear only with the clearest terms of repudiation of the

8

obligation of the contract." (*Hertz Driv-Ur-Self Stations, Inc. v. Schenley Distilleries Corp.* (1953) 119 Cal.App.2d 754, 760.) "[A] repudiation must consist of a present, positive unequivocal refusal to perform the contract." (*Gold Mining & Water Co. v. Swinerton* (1943) 23 Cal.2d 19, 28 (*Gold Mining*).)

The company's use of an agreement that Armour belatedly complained was "overbroad" was not a "present, positive unequivocal refusal to perform" the company's obligations under her employment agreement. (*Gold Mining*, *supra*, 23 Cal.2d at p. 28.) Indeed, it was not a repudiation of the contract at all. As Armour acknowledged at her deposition, the separation agreement offered the same compensation that her employment agreement described—six months' base salary and six months of COBRA premiums. Like her employment agreement, it conditioned the payment of severance on her signing a release of all claims against the Company. The agreement she was asked to sign was the company's standard form separation agreement and release.[1] Armour presented no evidence showing that the term "release," which was not defined in the amended employment agreement that she drafted, meant anything other than the company's standard separation agreement and release. She presented no evidence that she ever informed anyone at the company at any time before she signed her amended employment agreement that she understood the undefined term "release" to mean anything other than the company's standard agreement. Civil Code section 1440 does not help her.

Armour next contends that she satisfied the release condition in her employment agreement by providing a document that she was ready, willing, and able to sign. She is incorrect. The June 2007 agreement expressly provided that "[t]he severance offer contained in this Letter will expire and be of no further force and effect at midnight in

---

[1]    At her deposition, Armour identified substantially similar agreements that were given to employees terminated in earlier RIF's. She acknowledged that before the company's April 2006 RIF, she had "recommended" use of the standard form separation agreement and release and had also "strongly advised[d] that no alteration whatsoever beyond completing the template be made to the content of these documents."

9

Atlanta, Georgia on July 2, 2007 . . . ."  The proposed unsigned release that Armour

claims satisfied the condition was e-mailed by her counsel on July 12, 2007, which was

10 days after the agreement's July 2, 2007 expiration date.  Armour presented no

evidence showing that she proffered any form of release before the July 2, 2007 deadline.

Because she failed to raise a triable issue of material fact concerning her satisfaction of

the release condition in her employment agreement, the trial court properly granted

summary adjudication in favor of defendants on her first cause of action.


## B.  Claimed Breach of the Movius RIF Policy

Armour contends that the trial court erred in granting summary adjudication on her

third cause of action because there was a triable question of fact about the company's

"real reason" for terminating her.  She argues that her January 19, 2007 termination letter

informed her that her employment was being terminated " 'due to restructuring.' "  That,

she claims, entitled her to severance benefits under the Movius RIF policy for employees

involuntarily terminated " 'due to a reduction in force/downsizing . . . or job

elimination.' "  Armour argues that the trial court "mistakenly" determined that her failure

to move to Georgia made her ineligible under the policy.  We disagree.

Defendants presented evidence establishing the terms of the RIF policy, which

expressly did not apply to "terminations for . . . refusal to be relocated."  Arun Sobti, the

company's chairman and chief executive officer, declared that he "offered [Armour] a

position with IP Unity Glenayre in Atlanta, and told [her] that her continued employment

with IP Unity Glenayre would be contingent on her relocating [to] Atlanta."  Sobti

declared that "[Armour] told me that she did not want to relocate to Atlanta and would

not accept the position.  [Her] refusal to relocate factored into the decision to terminate

her employment as a result of the reduction in force . . . ."

Armour's deposition testimony was consistent with Sobti's account.  She

acknowledged that she had been offered and had turned down a position with the

10

company in Atlanta because she "didn't want to move to Georgia where the new company was going to be headquartered." She knew that turning down the position in Atlanta would likely result in the termination of her employment. She "told the CEO that he should make Tim Cohen . . . the general counsel of Movius." She "suggested that Tim Cohen replace [her]," and she understood that she had "given her spot away" by doing so. This evidence satisfied defendants' initial burden of showing that Armour refused to relocate to Georgia, which made her ineligible for severance benefits under the Movius RIF policy. The burden then shifted to her to raise a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(1); *Aguilar*, *supra*, 25 Cal.4th at p. 850.)

In an attempt to do so, Armour submitted a declaration asserting that she "was never asked to relocate to Georgia by Arun Sobti or anyone else at IP Unity. Nor was I ever told by Arun Sobti or anyone else that my job at IP Unity Glenayre was dependent on my moving to Georgia." Defendants objected to this evidence as irrelevant because it contradicted Armour's deposition testimony. The trial court sustained the objection, and Armour challenges that ruling on appeal. Her challenge is without merit.

"It is well-established that 'a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses.' [Citations.]" (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087.) " 'When discovery, properly used, makes it "perfectly plain that there is no substantial issue to be tried" [citation], section 437c, Code of Civil Procedure, is available for prompt disposition of the case.' [Citations.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 (*D'Amico*), disapproved on another ground in *Woodland Hills Residents Assn. Inc. v. City Council* (1979) 23 Cal.3d 917, 944.) "Moreover, when discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be tried, certain of those stern requirements applicable in a normal case are relaxed or altered in their operation." (*D'Amico*, at p. 21.) "The reasons for this attitude toward the legitimate products of discovery are clear. As the law recognizes in

11

other contexts . . . admissions against interest have a very high credibility value. This is especially true when . . . the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts. Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits. [Citation.]" (*D'Amico*, at p. 22.)

"Although our review of a summary judgment motion is de novo, we review the trial court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122.) We discern no abuse of discretion here. Armour's assertion that she "was never asked to relocate to Georgia," was contradicted by her deposition testimony that she had been offered a position *in Georgia*. It seems plain that the offer of a position *in Georgia* contains the implicit requirement of a relocation *to Georgia*. Armour certainly understood the offer that way. At her deposition, she testified that she turned the offer down *because she did not want to move to Georgia*. The trial court properly excluded this portion of Armour's declaration.

Armour's second assertion, that she was never "told . . . that [her] job at IP Unity Glenayre was dependent on [her] moving to Georgia," was also properly excluded. Armour maintains that this assertion did not literally contradict her deposition testimony that she knew "that not accepting the position . . . would likely result in the termination of [her] employment," since "[a] 'likely result' is different than a certainty." That may be true, but it is also irrelevant, because other deposition testimony showed that Armour fully understood that by declining the offer of a position in Georgia and suggesting that Cohen replace her, she had "given her spot away."

Armour's deposition testimony established that she was a highly-placed executive who had "played a pretty instrumental role" in the transactions that resulted in the

12

creation of the new company. As senior vice-president and corporate counsel of the acquiring company, Armour would have understood that the new company would not need *two* executives in that position. Yet she declined a position in Georgia and "told the CEO that he should make Tim Cohen, who was the general counsel of the Georgia company, the general counsel of Movius." She "suggested that Cohen replace [her]," and by doing so, gave her spot away. Her deposition testimony established that she did not need to be told point blank that she would be terminated if she did not move. The statements in her declaration were properly excluded as irrelevant.

Armour insists, however, that "[n]ot wanting to move is not a *refusal* to move" and "[t]urning down an *opportunity* to move is not a refusal to move." Her semantic arguments are not persuasive. There are many ways in which a senior corporate executive can communicate a refusal to relocate without expressly invoking the word "refuse." To "refuse" means "to express oneself as unwilling to accept" or "to show or express unwillingness to do or comply with." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) pp. 983-984.) Here, Armour unequivocally expressed an unwillingness to move to Georgia. She turned down a position with the new company there and told the company, its investors, and its shareholders that she did not want to relocate to Georgia. In short, she "refused" to move to Georgia. (*Ibid.*) That refusal made her ineligible for severance benefits under the Movius RIF policy, as the trial court properly determined.

Relying on her January 17, 2007 termination letter and on the June 5, 2007 e-mail she received from the company, neither of which mentioned her refusal to relocate, Armour next argues that there was a triable issue of fact about the company's "real reason" for her termination. To the extent she claims she was entitled to benefits under the Movius RIF policy because the company did not mention her refusal to relocate in its written correspondence with her, we reject the contention. It was undisputed that she refused to relocate to Georgia and that her refusal to relocate "factored into the decision to terminate her employment as a result of the reduction in force." There is nothing

13

inconsistent about a termination "due to restructuring" and a termination resulting from a failure to relocate. The terms are not mutually exclusive. One can reasonably conclude from the evidence in this case that Armour's position was eliminated "due to restructuring" after she refused to relocate to Georgia and "told the CEO that he should make Tim Cohen . . . the general counsel of Movius," giving her spot away. The company's wording of its severance letter did not create a triable issue of fact.

Armour next asserts that IP Unity Glenayre "had no right to insist that [she] move to Georgia" because her original employment contract specified that her primary work location would be in Milpitas. She does not develop the point further. She does not explain how the provision she relies on entitled her to severance under the employment agreement or under the Movius RIF policy. Moreover, it is not clear that the provision she relies on survived the amendment of her employment contract. " 'When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary.' [Citations.]" (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 (*Ochoa*).)

Armour's assertion here fails for a more fundamental reason. She did not raise the argument below. " 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider.' " (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830.) "It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal." (*Ochoa*, *supra*, 61 Cal.App.4th at p. 1488, fn. 3 [refusing to consider argument that Ochoa failed to raise in opposition to the defendant's motion for summary judgment].) We deem the argument forfeited.

### III. Disposition

The judgment is affirmed.

14

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.



_____
Márquez, J.