Filed 9/19/14  Lu v. Deng CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MEI-CHIEN LU, | H037860 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-10-CV169316) |
| v. | |
| AN-CHANG DENG, | |
| Defendant and Respondent. | |

Plaintiff Mei-Chien Lu appeals from the order granting summary adjudication in favor of defendant An-Chang Deng on her causes of action for intentional infliction of emotional distress, breach of fiduciary duty, actual fraud, constructive fraud, and reimbursement and indemnity.  Plaintiff also appeals from the order granting defendant's motion for nonsuit on her cause of action for negligent infliction of emotional distress.[1]  We find no error and affirm the judgment.

---

[1]     Though plaintiff states on the first page of her opening brief that she "does not challenge the ruling[] on . . . negligent infliction of emotional distress" and asks for this court "to grant 'leave to amend'" for this cause of action, she argues in her reply brief that the trial court erred when it granted the motion for nonsuit for negligent infliction of emotional distress.  Since defendant argued in his brief that the trial court properly granted the motion, we will consider the issue.  (See *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

## I. Statement of the Case

On April 14, 2010, plaintiff filed a complaint for damages. The complaint states causes of action for domestic violence (first), intentional infliction of emotional distress (second), negligent infliction of emotional distress (third), breach of fiduciary duty (fourth), actual fraud (fifth), constructive fraud (sixth), and reimbursement and indemnity (seventh).

In April 2011, defendant brought a motion for summary judgment or summary adjudication. Plaintiff's opposition to the motion was filed in July 2011. Defendant filed a reply to plaintiff's opposition. The trial court denied the motion for summary adjudication as to the causes of action for domestic violence and negligent infliction of emotional distress and granted the motion as to the causes of action for intentional infliction of emotional distress, breach of fiduciary duty, actual fraud, constructive fraud, and reimbursement and indemnity.

During the jury trial, the trial court granted defendant's motion for nonsuit as to the negligent infliction of emotional distress cause of action. Following trial, judgment was entered in favor of defendant.

After the trial court denied plaintiff's motion for new trial, plaintiff filed a timely notice of appeal.

## II. Plaintiff's Allegations

The parties were married in 1985. Defendant was awarded his Ph.D. in electrical engineering from the University of California at Berkeley in 1986 while plaintiff was awarded her Ph.D. in material sciences and engineering from the same university in 1987. The parties then began working at high-technology companies. In 1991, their first son was born. In 1992, defendant joined EPIC Design Systems (EPIC), a start-up company, while plaintiff was employed by Intel Corporation. In late 1994, EPIC went public, and their second son was born.

In October 1995, while defendant was away on a business trip, plaintiff was in a car accident in which the parties' older son died. Due to the accident, plaintiff suffered profound grief. Defendant then "abandoned plaintiff and treated her cruelly." About a year after the accident, another son was born. Defendant "continued to make plaintiff feel guilty, . . . demeaned and belittled her," and began yelling at her frequently.

In early 1997, Synopsys, Inc. acquired EPIC, and defendant became an employee of Synopsys. In August 1998, defendant and other employees left Synopsys and formed Nassda Corporation.

In September 1998, plaintiff began suffering from physical illnesses and quit her job at Intel.

In February 2000, Synopsys brought an action against defendant for breach of proprietary information and related causes of action. Defendant did not explain the litigation to plaintiff.

After plaintiff rejected a job offer in 2000, defendant became more abusive towards plaintiff by yelling at her, arguing with her, yelling at their children, and telling her to "'go to hell.'"

In December 2001, Nassda underwent an initial public offering and its shares "became perceived as quite valuable." Defendant's language and behavior became more abusive. He attended business dinners and told plaintiff that he "wished [she] would die" more frequently.

In June 2004, defendant told plaintiff that they had lost the Synopsys litigation. He told her that Synopsys would acquire Nassda by paying $7 per share, he would not compete against Synopsys for four years, and the settlement would produce $6 million in cash for them. In November 2004, defendant presented plaintiff with some pages and told her to sign them, which plaintiff did. Defendant did not tell plaintiff about the significance of the pages or of the settlement agreement to which they referred.

3

In March or April 2005, defendant told plaintiff they should divorce. After the Synopsys litigation settlement closed in May 2005, defendant had plaintiff sign more documents related to the stock liquidation without telling her any details. Defendant then stopped working.

Defendant continued his abusive and angry behavior towards plaintiff. Defendant did not celebrate the parties' twentieth anniversary, but he took plaintiff to a park and told her that he wanted to murder her. "As a result of continued and ongoing abuse since 1995, plaintiff involuntarily suppressed and lost memories of that event, only to recall it later when her suppressed memories began to resurface."

At the end of 2005 or the beginning of 2006, defendant began to talk seriously about a divorce. When the parties argued, defendant "physically intimidated" plaintiff.

In mid-2007, defendant and plaintiff began living in separate rooms. In late 2007, plaintiff began wondering why she had not been given the Synopsys settlement agreement to read before she signed the signature pages.

In April 2008, defendant forced himself into plaintiff's room and scratched her arm.

In mid-2008, plaintiff located a copy of the settlement agreement at home and read it. She saw that it contained an admonition to the effect that she should consult with her own attorney before signing the signature pages. Sometime thereafter, she learned that the settlement agreement was incomplete and incorrectly described the parties' shares for settlement payments.

In October 2008, plaintiff moved out of the family residence and defendant filed a petition for marital dissolution.

The first cause of action for domestic violence incorporates by reference the previous allegations and alleges that "from approximately 1995 through 2008, defendant perpetrated upon plaintiff repeated, regular, and continuous domestic violence by, among other things, demeaning her, yelling at her, stating that he 'wished [she] would die,'

4

telling her to 'go to hell,' arguing with her, pushing her, assaulting her, treating her as a virtual slave beholden to him." As a result of defendant's acts, plaintiff suffered "humiliation, mental anguish, and emotional and physical distress, . . . [was] in reasonable apprehension of imminent serious bodily injury," was unable to work, and incurred medical expenses. This cause of action also alleges that defendant's actions were "willful, wanton, and malicious," thus entitling her to punitive damages.

The second cause of action for intentional infliction of emotional distress incorporates by reference the previous allegations and alleges that "[w]ithin two years last past and continuing through approximately October 2008, defendant intentionally . . . repeatedly, and continuously in a malicious, rude, violent and insolent manner, intimidated, argued with, and assaulted plaintiff, all with the intent and purpose of causing plaintiff" to suffer "humiliation, mental anguish, and emotional and physical distress." As a result of defendant's conduct, plaintiff was unable to work and incurred medical expenses. This cause of action also alleges that defendant's actions were "willful, wanton, malicious, and oppressive," thus entitling her to punitive damages.

The third cause of action for negligent infliction of emotional distress incorporates by reference the previous allegations and alleges that "[w]ithin two years past and continuing through approximately October 2008, defendant negligently, . . . regularly, and continuously in a rude, violent and insolent manner, intimidated, maligned, argued with, and assaulted plaintiff." It is further alleged that defendant knew or should have known that his abusive behavior would cause severe emotional distress to plaintiff. As a result of defendant's acts, plaintiff suffered "humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body," was unable to work, and incurred medical expenses.

The fourth cause of action for breach of fiduciary duty incorporates by reference the previous allegations and alleges that in January 2009, plaintiff obtained and read a copy of a discovery order in the Synopsys litigation which made the following findings:

5

one of Nassda's products was copied or derived from Synopsys' materials while the defendants were employed by Synopsys; Nassda's development log was created after the fact in an attempt to avoid liability to Synopsys; the defendants "intentionally altered, destroyed, damaged, lost and or misplaced" electronic media discussed in the discovery order; the conduct of the defendants in "altering, losing, misplacing and/or destroying relevant data" was done in concert by the defendants with the intent to conceal evidence of liability by Nassda and did conceal such evidence. The discovery order "severely compromised the ability of the Synopsys litigation defendants to defend against the claims made against them in the Synopsys litigation."

It is further alleges that when the parties in the Synopsys litigation reached a verbal settlement agreement, defendant knew: he might have had exposure for criminal prosecution for his actions in leaving Synopsys and starting Nassda; the discovery order findings meant that the Synopsys defendants would lose; plaintiff's property interest in Nassda would be negatively affected; he would become unemployed; he planned to dissolve his marriage soon after the settlement was completed; the written settlement agreement had language recommending and advising plaintiff to consult an attorney; and the signature pages that were given to plaintiff in November 2004 were part of a much larger set of documents.

This cause of action also alleges that "[b]ecause of their marital relationship, and because settlement of the Synopsys litigation would have material effects of the rights of plaintiff, defendant had fiduciary duties to fully disclose to plaintiff all material facts concerning the Synopsys litigation and its settlement . . . before asking [plaintiff] to sign the Signature Pages." By failing to make these disclosures, defendant breached his fiduciary duties. As a result of defendant's breach of fiduciary duties, plaintiff signed the settlement agreement "in ignorance of its effects on her and of her rights" and suffered damages in the amount of approximately $10 million. Plaintiff's rights included a right to "claim ownership of her Nassda Corporation shares as a bona fide purchaser and to

6

claim that defendant's actions giving rise to the liability being settled were not for the benefit of the community but were the result of defendant's intentional misconduct and/or criminal behavior, for which defendant should bear the burden, not plaintiff." Plaintiff first became aware of the discovery order and of the economic consequences of the settlement agreement to her in early 2009.

The fifth cause of action for actual fraud incorporates by reference the previous allegations and alleges that defendant presented the signature pages of the Synopsys settlement agreement to plaintiff without fully disclosing all material facts. It further alleges that had defendant informed her of the material facts, she would not have signed the settlement agreement. Plaintiff would have retained counsel to inform her of, and to protect, her rights, "including her rights to claim ownership of her Nassda Corporation shares as a bona fide purchaser and to claim that defendant's action giving rise to the liability being settled were not for the benefit of the community but were the result of defendant's intentional misconduct and/or criminal behavior, for which defendant should bear the financial burden." As a result of defendant's fraud, plaintiff has suffered damages of approximately $10 million. This cause of action also alleges that defendant's actions were "willful, wanton, malicious, and oppressive," thus entitling her to punitive damages.

The sixth cause of action for constructive fraud incorporates by reference the previous allegations and alleges that defendant's failure to disclose material facts about the Synopsys settlement agreement before having her sign the signature pages constitutes constructive fraud. Had defendant informed her of the material facts, she would not have signed the document and would have retained counsel to inform her of, and to protect, her rights. As a result of defendant's acts, plaintiff suffered damages of approximately $10 million.

The seventh cause of action for reimbursement and indemnity incorporates by reference the previous allegations. It alleges that "[a]s a result of defendant's actions, the

7

martial community had to settle an action which cost the marital community no less than $19 million, which should have been paid by defendant, not by the community property. [¶] . . . The community estate is entitled to reimbursement from defendant's separate property (and plaintiff is entitled to reimbursement and/or indemnity from defendant's share of the community property) for the amount paid to Synopsys, Inc. in settlement of the Synopsys litigation."

## III.   Discussion
### A.  Motion for Summary Adjudication
#### 1.  Standard of Review

" ' "Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." ' " (*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 993.)  "[T]he party moving for summary judgment bears the burden of persuasion that there are no triable issues of material fact and that [the moving party] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  The moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)  "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

#### 2.  Defendant's Evidence

With the exception of physical altercations in 2007 and 2008, plaintiff did not recall "anything" that defendant had done to her that caused her to suffer emotional distress after January 2007, except that he kept coming into her room when they were supposed to be staying in separate rooms.  Defendant did not assault or hit plaintiff after 2007, except for one incident in April 2008.

8

The position that defendant held at Nassda was "for the benefit of [their] marital community as the income from [his] job, etc. was generating community property income." After Nassda underwent an initial public offering in December 2001, plaintiff became very familiar with its stock prices as she regularly transferred shares of Nassda stock each quarter. When the parties involved in the Synopsys litigation had reached a tentative agreement, defendant told plaintiff about the keys terms of the settlement. He told her that Synopsys would acquire Nassda by paying $7 per share, he would not compete with Synopsys for four years, and they would receive shares with a value of $6 million. In November 2004, he had the attorney involved in the litigation e-mail plaintiff a copy of the settlement agreement. When defendant brought plaintiff the documents to sign, they were not fighting and he did not put pressure on her to sign them. When she asked what would happen if she did not sign them, he replied that there would be no settlement. Plaintiff did not ask defendant where the other pages of the settlement agreement were. She did not read what she was signing, and never thought about whether there were other pages. After signing the settlement agreement, plaintiff never asked defendant about the Synopsys litigation.

Defendant brought home all of the documents involved in the Synopsys litigation on May 11, 2005, and put them on a shelf. In 2007, plaintiff attempted to read the documents, but "got a big headache . . . couldn't continue, so [she] was not able to read it."

Plaintiff thinks that defendant should have divorced her before entering into the Synopsys settlement agreement.

As a result of the settlement agreement, the community estate gained over $6 million.

Defendant and plaintiff never signed any agreement between the two of them as adverse parties.

9

### 3. Plaintiff's Response

Defendant pushed plaintiff away from the table in 2000 and her sweater was torn. In 2005, defendant kicked plaintiff's chair. He hit her on the shoulder on another occasion in 2005 as she was sitting on a sofa and placed his hands around her shoulders. He also hit her on her chest and shoulder in late 2005 or early 2006 when she was sitting in a recliner. She did not remember how many times he hit her, but he stopped when their older child said, "No, Dad." Before July 2007, he struck her with his hand. One afternoon in April 2008, plaintiff was sitting behind her bedroom door reading when defendant said that he wanted to come in so he could use the bathroom. She asked him to use another bathroom, but he "couldn't hold on." He pushed the door open and struck her. It hit her so hard that it scratched her arm. On their 20th anniversary in 2005, defendant took her to a park where he told her that he wanted to murder her.

Defendant told plaintiff that he did nothing wrong in connection with the Synopsys litigation. When defendant talked about the litigation, he yelled at her. Defendant failed to tell plaintiff about the discovery order that found that he and his codefendants had stolen trade secrets from Synopsys and had direct involvement in destroying evidence. He also failed to tell her that her separate property shares of Nassda stock and her interest in the community Nassda stock would be sold to pay $20 million to Synopsys to extinguish the liability that defendant faced. Defendant admitted that he paid $19,683,157 to Synopsys, and $1.288 million of this amount came from plaintiff's separate property account. If the parties had not been required to pay Synopsys, they would have received $34 million from the sale of the Nassda stock. Defendant also never told plaintiff that there was language in the settlement agreement instructing the parties to consult an attorney.

Defendant received a phone call on November 30, 2004, from his attorney asking the best way to send a document to plaintiff and defendant did not remember whether it was sent by e-mail or fax. The document was not the entire settlement agreement, but

10

"some of the documents related to our family community." He does not remember how much of the settlement agreement was sent. Plaintiff did not know that there was anything more to the settlement agreement other than the pages that were provided to her by defendant.

Plaintiff has been significantly damaged by defendant's actions, because her separate property was used to pay off a debt owed solely by defendant to Synopsys. The community estate should have gained far more than $6 million. If they had not paid Synopsys over $19 million, they would have received $34 million for the Nassda shares.

Plaintiff and defendant signed various settlement documents which affected both their community and separate property interests.

### 4. Defendant's Reply

When defendant opened the door to plaintiff's bedroom in 2008, he did not know that she was behind the door.

### 5. Trial Court's Ruling

The trial court denied the motion for summary adjudication as to the cause of action for domestic violence on the ground that it was not barred by the statute of limitations. The trial court granted the motion on the intentional infliction of emotional distress cause of action. The trial court concluded: the only act that occurred within the two-year statute of limitations was the April 2008 incident in which defendant opened the door and plaintiff's arm was scratched; this act did not constitute intentional infliction of emotional distress as a matter of law; and the continuing tort doctrine did not apply. The motion was denied as to the cause of action for negligent infliction of emotional distress. The trial court reasoned that the continuing tort doctrine did not apply and thus only the April 2008 incident was not barred by the statute of limitations. However, the trial court found that defendant failed to demonstrate that he did not cause any damages to plaintiff as a result of the scratch or that he failed to use due care in opening the door.

11

The trial court found that the breach of fiduciary duty, fraud, and constructive fraud causes of action were barred by the statute of limitations and granted the motion as to these claims.  The motion was also granted as to the reimbursement and indemnity cause of action.  The trial court reasoned:  plaintiff failed to allege that her separate property was used to satisfy the obligation to Synopsys; there was no evidence of defendant's misconduct; and the settlement benefited the community.

### 6.  Intentional Infliction of Emotional Distress Cause of Action

Plaintiff contends that the trial court erred when it granted summary adjudication on the intentional infliction of emotional distress claim.

"A cause of action for intentional infliction of emotional distress exists when there is ' " " "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.]  A defendant's conduct is 'outrageous' when it is so ' " " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.]  And the defendant's conduct must be ' " " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.]  [¶]  Liability for intentional infliction of emotional distress ' " does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citations.] ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.)  "Moreover, ' " [i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." ' [Citations.]" (*Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 44.)

12

The statute of limitations for the tort of infliction of emotional distress is two years. (Code Civ. Proc., § 335.1;[2] *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1450 (*Pugliese*).)

Here, the intentional infliction of emotional distress cause of action focused on defendant's conduct during the period of April 2008 and October 2008. Defendant presented plaintiff's deposition testimony that she did not recall "anything" that defendant had done to her that caused her to suffer emotional distress after January 2007 with two exceptions: he kept coming into her room when they were supposed to be staying in separate bedrooms, and a physical altercation in 2008. Though a spouse's conduct of entering into the other spouse's room without permission may be annoying, it cannot be characterized as extreme and outrageous. As to the April 2008 incident, plaintiff testified that as she was sitting behind her bedroom door, defendant wanted to come in to use the bathroom. She asked him to use the other bathroom, but he said that he could not. He then pushed the door so hard that her arm was scratched and they had an argument. As a matter of law, this incident also cannot be considered extreme and outrageous. Thus, the trial court did not err when it concluded that defendant was entitled to judgment on this cause of action.

Relying on *Pugliese*, *supra*, 146 Cal.App.4th 1444, plaintiff contends that the continuing tort doctrine applies to her claim for emotional distress. "Generally, a limitations period begins to run upon the occurrence of the last fact essential to the cause of action. [Citation.] However, where a tort involves a continuing wrong, the statute of limitations does not begin to run until the date of the last injury or when the tortuous acts cease. [Citation.]" (*Id.* at p. 1452.) In *Pugliese*, the issue was whether the petitioner was barred under the three-year limitations period set forth in section 340.15 from recovering

---

[2] All further statutory references are to the Code of Civil Procedure unless stated otherwise.

for acts of domestic violence that occurred three years prior to the filing of the complaint. (*Id.* at p. 1448.) *Pugliese* focused on the statutory language that "domestic violence lawsuits must be commenced within three years 'from the date of the *last act* of domestic violence . . . .'" (*Id.* at p. 1451.) Thus, *Pugliese* held that domestic violence is a continuing tort for statute of limitations purposes if the victim proves a continuing course of abusive conduct. (*Ibid.*)

In *Pugliese*, the petitioner also alleged a cause of action for intentional infliction of emotional distress and that the last act of emotional abuse occurred less than two years prior to the filing of her complaint. (*Pugliese*, *supra*, 146 Cal.App.4th at p. 1450.) Thus, *Pugliese* concluded that her intentional infliction of emotional distress cause of action was timely under section 335.1. (*Ibid.*) However, *Pugliese* did not consider whether the continuing tort doctrine applied to the intentional infliction of emotional distress cause of action. We decline to extend the holding of *Pugliese* to the present case. In contrast to the statutory language of section 340.15, section 335.1 states that actions must be commenced "[w]ithin two years." Moreover, even if we were to apply the continuing tort doctrine, plaintiff testified at her deposition that with two exceptions she did not suffer emotional distress as a result of defendant's conduct after January 2007. Since we have concluded that these incidents did not constitute extreme and outrageous behavior as a matter of law, plaintiff's emotional distress cause of action was also untimely under the continuing tort doctrine.[3]

---

[3] Plaintiff also argues that the trial court erred when it denied the motion for new trial on the intentional infliction of emotional distress cause of action. However, the motion for new trial was not brought on this ground.

14

### 7. Breach of Fiduciary Duty, Fraud, and
### Constructive Fraud Causes of Action

Plaintiff contends that the trial court erred when it granted the motion for summary adjudication as to the causes of action for breach of fiduciary duty, fraud, and constructive fraud. We shall consider these claims together, since they are based on defendant's alleged breach of his duty to plaintiff by failing to disclose facts relevant to her decision to sign the Synopsys settlement agreement.

"Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships . . . . This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request." (Fam. Code, § 1100, subd. (e).)

"The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.)

The elements of a cause of action for constructive fraud are (1) the existence of a fiduciary relationship, (2) nondisclosure, that is, breach of the fiduciary duty, (3) intent to deceive , and (4) reliance and resulting injury. (*Stokes v. Henson* (1990) 217 Cal.App.3d 187, 197.)

These causes of action are governed by the three-year limitations period set forth in section 338, subdivision (d). (§ 338, subd. (d) [fraud claims]; *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1391 (*Alfaro*).) Generally, a cause of action accrues, and thus triggers the statute of

15

limitations, when it "'is complete with all of its elements.' [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.) However, under the discovery rule a cause of action does not accrue until a plaintiff discovers, or has reason to discover, the cause of action. (*Ibid.*) Section 338, subdivision (d) has codified this rule for fraud actions. It provides that a "cause of action [for fraud] is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (§ 338, subd. d.)

Here, the alleged breach of fiduciary duty and fraud occurred in November 2004 when plaintiff signed the settlement agreement. Defendant presented evidence that he told plaintiff about the keys terms of the settlement prior to her signing the document, that is, that Synopsys would acquire Nassda by paying $7 per share, he would not compete with Synopsys for four years, and they would receive shares with a value of $6 million. When plaintiff asked defendant what would happen if she did not sign the documents, he replied that there would be no settlement. Plaintiff did not read what she was signing, did not ask defendant where the other pages of the settlement agreement were, and never thought about whether there were other pages. After signing the settlement agreement, plaintiff never asked defendant about the Synopsys litigation. Plaintiff also knew that defendant brought home all of the settlement documents involved in the Synopsys litigation on May 11, 2005, and put them on a shelf.

As this court has stated, "[a] person in a fiduciary relationship may relax, but not fall asleep. '[I]f she became aware of facts which would make a reasonably prudent person suspicious, she had a duty to investigate further, and she was charged with knowledge of matters which would have been revealed by such an investigation.' [Citation.]" (*Alfaro*, *supra*, 171 Cal.App.4th at p. 1394.) Here, plaintiff concedes that she did not read the settlement agreement prior to signing it. She also concedes that she had access to it after May 11, 2005, when defendant put it on a shelf in their home, and yet she still did not read it. She argues, however, that she did not become suspicious

16

about its terms until after she read the discovery order in 2009 and thus these causes of action were not barred by the three-year statute of limitations. Based on that document, she learned: defendant and his codefendants had stolen trade secrets from Synopsys and had direct involvement in destroying evidence; and her separate property shares of Nassda stock and her interest in the community Nassda stock would be sold to pay $20 million to Synopsys to extinguish the liability that defendant faced. However, if plaintiff had read the settlement agreement, she would have learned that she and defendant were paying $19,683,157 to Synopsys to settle its claims against defendant. She would have also been advised to consult an attorney. Given the very substantial amount of money involved and the complexity of the transaction, a reasonably prudent person would then have consulted an attorney for advice regarding its impact on her rights. Since the trial court did not err in finding that plaintiff failed to demonstrate the existence of a triable issue of material fact as to the timeliness of these claims, it properly granted the motion for summary adjudication as to the causes of action for breach of fiduciary duty, actual fraud, and constructive fraud.

## 8.  Reimbursement and Indemnity

Plaintiff next challenges the trial court's ruling in which it granted summary adjudication as to the reimbursement cause of action.[4]

The seventh cause of action for reimbursement and indemnity alleges that the marital community settled the Synopsys action for $19 million as a result of defendant's actions, and thus "[t]he community estate is entitled to reimbursement from defendant's

---

[4]     Plaintiff also contends that the trial court erred when it denied her motion for new trial on this cause of action. She asserts that her "incomplete deposition could have affected Judge's perception." There is nothing in the record to support her position.

17

separate property (and plaintiff is entitled to reimbursement and/or indemnity from defendant's share of the community property)" for $19 million.[5]

Under Family Code section 1000, subdivision (b), the liability of a married person shall be satisfied from separate or community property depending on whether the act or omission giving rise to liability "occurred while the married person was performing an activity for the benefit of the community."

Plaintiff contends that courts should "look to the nature of the tortious conduct and the motivation behind it, and find that there is not benefit to the community if the conduct is intentional or criminal." Thus, she claims that it would be inequitable for her to share the net loss for defendant's misconduct.

*In re Marriage of Stitt* (1983) 147 Cal.App.3d 579 (*Stitt*) and *In re Marriage of Partridge* (1990) 226 Cal.App.3d 120 (*Partridge*) focused on the nature of the spouse's misconduct. *Stitt* held that the wife was responsible for unpaid attorney's fees incurred by her for her defense against embezzlement charges in civil and criminal litigation. (*Stitt*, at p. 582.) *Stitt* also noted that there was no evidence that the embezzlement

---

[5] Plaintiff contends that the trial court erred when it found that the complaint did not allege her separate property damages. She relies on language in the complaint that the settlement agreement required the sale of "their" shares in Nassda and that "plaintiff's property interests" in Nassda would be reduced by the settlement agreement. We disagree with plaintiff's interpretation of the complaint. These two paragraphs state: "The verbal settlement agreement reached with Synopsys, Inc. called for Defendant and plaintiff: [¶] to sell their shares in Nassda Corporation for merger with Synopsys, Inc. for approximately $33,876,000; [¶] to pay capital gains on the sale of about $8,650,700; [¶] to pay Synopsys, Inc. about $19,683,157 in settlement of Synopsys, Inc.'s claims against Defendant. [¶] The verbal settlement agreement reached with Synopsys, Inc. would reduce plaintiff's property interests in Nassda Corporation from an after-tax value of about $12,613,000 ($33,876,000 less $8,650,000 = $25,226,000 divided by 2) to about $2,771,421 ($33,876,000 less $8,650,000 = $25,226,000 less $19,683,157 = $5,542,843 divided by 2); a loss of about $10,000,000." If plaintiff had also sought a separate property interest in the Nassda shares, the complaint would have sought more than one half of the value of the Nassda shares. Thus, the complaint seeks reimbursement only for her community property interest in the Nassda shares.

18

benefited the community. (*Stitt*, at p. 587.) In *Partridge*, the husband failed to file quarterly estimated taxes. (*Partridge*, at p. 123.) In the dissolution proceedings, the husband agreed to pay all tax penalties, but argued that the wife was responsible for one-half of the community tax debt. (*Partridge*, at pp. 123-124.) *Partridge* rejected the wife's argument that the husband had breached his fiduciary duty to her, since the wife assisted the husband with bookkeeping and thus should have been aware that he was not making the tax payments. (*Partridge*, at p. 126.) *Partridge* concluded that "the undisputed facts show the nature of husband's conduct was not such that the court was entitled to make an uneven allocation of liability for debt under the deliberate misappropriation doctrine." (*Partridge*, at p. 127.)

Other cases have focused on whether there was a benefit to the community as a result of the spouse's conduct. *In re Marriage of Hirsch* (1989) 211 Cal.App.3d 104 (*Hirsch*) involved gross negligence by the husband which benefited the community. In *Hirsch*, the husband sought reimbursement for one-half of the amount he paid to settle a lawsuit, including attorney's fees and costs. (*Id.* at p. 106.) *Hirsch* discussed *Stitt*, stating: "Confined to its facts, *Stitt* is correct. An innocent spouse is not required to share in losses incurred by the intentionally tortious or criminal conduct of a spouse where there is no benefit to the community. But the holding in *Stitt* is overbroad because it includes negligent as well as intentional torts. Thus, to the extent *Stitt* holds the negligent conduct of a spouse engaged in an activity benefiting the community provides sufficient justification to characterize a debt as a separate obligation, it is incorrect." (*Hirsch*, at p. 110, fn. omitted.) *Hirsch* then noted that "[a]lthough intentional torts and crimes rarely benefit the community, we can envision situations in which the community would be enriched by such conduct. For example, had wife put the embezzled funds into a community account or other community property, it would have been appropriate for the community to bear the corresponding loss." (*Id.* at p. 110, fn. 8.) *Hirsch* also reasoned that the characterization of the spouse's tortious conduct which gave rise to the

19

resulting obligation as either negligent or intentional did not resolve the issue of reimbursement. (*Id.* at pp. 110-111.) *Hirsch* concluded that courts must consider whether the spouse's conduct benefited the community. (*Id.* at p. 111.) Since the husband presented evidence that his exposure to liability arose out of his conduct while serving on the bank's board of directors during the marriage and the funds he received for serving on the board were community property, *Hirsch* held that the settlement obligations were not the husband's separate debt. (*Ibid.*)

In *In re Marriage of Bell* (1996) 49 Cal.App.4th 300 (*Bell*), the wife embezzled funds from her employer during the marriage, and used some of the money for community expenses and deposited the remainder in joint accounts. (*Bell*, at pp. 302, 303-304.) In the dissolution proceedings, the wife sought allocation of the cost of the civil settlement to the community. (*Bell*, at pp. 304-305.) Relying on *Stitt*, *supra*, 147 Cal.App.3d 579, the trial court found that whether the community benefited from the wife's conduct was irrelevant. (*Bell*, at pp. 305-306.) However, the Court of Appeal held that since the community benefited from the wife's embezzlement, the community bore the liability for the cost of the settlement and reversed the judgment. (*Bell*, at pp. 310-311.)

In our view, the present case is analogous to *Bell*, *supra*, 49 Cal.App.4th 300. Here, defendant presented evidence that he started Nassda, became its President and Chief Operating Officer during the marriage, and his position generated community property income. Plaintiff now seeks reimbursement for her community interest in the Nassda stock that was worth approximately $34 million prior to the Synopsys litigation. However, the value of the Nassda stock at that time was based on defendant's efforts during the marriage. Assuming that these efforts included misappropriation of proprietary information from defendant's prior employer, they nonetheless benefited the community by increasing the value of their stock portfolio. To reimburse plaintiff for the value of the stock prior to the settlement with Synopsys would allow her to benefit from

defendant's misconduct. Plaintiff's attempt to distinguish *Bell* on the ground that there is "no undisputed evidence that the community put the Nassda shares to its use" is not persuasive. Whether the shares were sold to meet community expenses or simply left in a joint account is irrelevant. (See *Hirsch*, *supra*, 211 Cal.App.3d at p. 110, fn. 8.) Accordingly, we conclude that the trial court properly granted the motion for summary adjudication for reimbursement and indemnity.[6]

## B.  Motion for Nonsuit

Plaintiff contends that the trial court erred when it granted defendant's motion for nonsuit as to her cause of action for negligent infliction of emotional distress.[7]

Here, the trial court stated: "I don't think the plaintiff proved the necessary elements of negligent infliction of emotional distress. I don't know how you shoehorn some kind of duty into not opening a door that somebody you don't know is sitting right in front of you. [¶] And I don't know that there was any evidence to suggest that incident in and of itself, . . . was a source of severe emotional distress to the plaintiff."

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] . . . [¶] In reviewing a grant of nonsuit, we are 'guided by the same

---

[6]    Plaintiff also argues that there were triable issues of material fact regarding whether defendant acted for the benefit of the community. She argues that defendant "abandoned the family," abused her, "hinted sexual affairs," and thus the community was not benefited by defendant's position as President and Chief Operating Officer of Nassda. There is no support in case law for this position.

[7]    Relying on *Pugliese*, *supra*, 146 Cal.App.4th at pp. 1451-1456, plaintiff also contends that the trial court erred in limiting her claim for negligent infliction of emotional distress to the April 2008 incident. As previously stated, *Pugliese* is distinguishable. In contrast to the statutory language of section 340.15, section 335.1, which applies to a negligent infliction of emotional distress cause of action, states that actions must be commenced "[w]ithin two years."

rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.]  We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citation.]"  (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

In *Wong v. Tai Jing* (2010) 189 Cal.App.4th 1354, this court set forth the principles applicable to the present issue.  "A claim of negligent infliction of emotional distress is not an independent tort but the tort of negligence to which the traditional elements of duty, breach of duty, causation, and damages apply.  [Citations.]  [¶]  In *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, the Supreme Court made it clear that to recover damages for emotional distress on a claim of negligence where there is no accompanying personal, physical injury, the plaintiff must show that the emotional distress was 'serious.'  (*Id.* at pp. 927-930; see *Burgess v. Superior Court* [1992] 2 Cal.4th at p. 1073, fn. 6. ['[t]he requirement that the emotional distress suffered be "serious" has its origins in *Molien*']; *Potter [v. Firestone Tire & Rubber Co.* (1993)] 6 Cal.4th at p. 999 [emotional distress must be 'serious']; *Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 . . . ['serious'].)  [¶]  Moreover, the court explained, ' "serious emotional distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." [Citation.]'  (*Molien*, *supra*, 27 Cal.3d at p. 928 . . . .)"  [¶]  In our view, this articulation of 'serious emotional distress' is functionally the same as the articulation of 'severe emotional distress.'  Indeed, given the meaning of both phrases, we can perceive no material distinction between them and can conceive of no reason why either would, or should, describe a greater or lesser degree of emotional distress than the other for purposes of establishing a tort claim seeking damages for such an injury."  (*Wong*, *supra*, 189 Cal.App.4th at pp. 1377-1378.)

22

Here, plaintiff testified that they started to live in separate bedrooms in July 2007. Though defendant moved into the children's bedroom, he continued to enter the master bedroom to use the adjoining bathroom. After plaintiff had gone to sleep, he "would come in and do other things" and plaintiff was "very annoyed" and was "mentally stressed every time he came in." One afternoon in 2008, she sat in a chair "right behind the door of the master bedroom" with the door closed. When defendant returned home, he wanted to enter. Plaintiff asked him to use the other bathroom. She believed that he knew that she was right by the door, because her "voice was so close," he should have been able to determine where she was sitting. However, defendant pushed the door open and her arm was scratched. The scratch was about two to three inches long and was "not a sharp scratch, it's like a door, edge of the door." Even assuming that a reasonable jury would have concluded that defendant could have determined that plaintiff was sitting behind the closed door by the sound of her voice and thus knew that he would hit her by opening the door, there was no evidence that she suffered serious emotional distress as a result of his act. As a matter of law, a reasonable person, who had placed herself in front of a closed door, would have been able to adequately cope with the mental stress of defendant's conduct of opening the door, which then scratched her arm. Thus, the trial court did not err in granting the motion for nonsuit.[8]

---

[8] It appears that plaintiff also argues that there was more than one incident in which defendant forced himself into the master bedroom and injured her. First, the evidence to which plaintiff refers was presented after the motion for nonsuit was granted. Second, this evidence does not support her claim. Defendant testified that plaintiff had mentioned an incident in April but he did not recall any incident in which she placed a chair behind the door. He then testified that there were many incidents between July 2007 and October 2008 in which he knocked on the door so he could get his clothes, entered, and then left.

## IV.  Disposition

The judgment is affirmed.  Costs on appeal are awarded to defendant.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Grover, J.